IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| PAPALOTE CREEK II, LLC, f/k/a<br>Papalote Creek Windfarm II, LLC,<br>    Plaintiff & Counter-Defendant,<br>-vs-<br><br>LOWER COLORADO RIVER<br>AUTHORITY,<br>    Defendant & Counter-Plaintiff. | CAUSE NO.:<br>AU-16-CA-01097-SS<br>AU-19-CA-00284-SS |

## ORDER

BE IT REMEMBERED on this day the Court considered the file in the above-styled cause, and specifically Plaintiff and Counter-Defendant Lower Colorado River Authority (LCRA)'s Brief on the Merits [#30]; Defendant and Counter-Plaintiff Papalote Creek II, LLC (Papalote)'s Brief on the Merits [#31]; Papalote's Motion for Summary Judgment [#36]; LCRA's Response and Cross-Motion for Summary Judgment [#39]; and Papalote's Motion to Strike Extrinsic Evidence [#32]. Having reviewed the parties' briefing, the relevant law, the arguments of counsel, and the case file as a whole, the Court now issues the following opinion and orders.

## Background

### I.    Introduction

In 2009, Papalote and LCRA entered into an agreement wherein Papalote agreed to build an 87-turbine wind farm and LCRA agreed to purchase all of the energy produced by the farm, at a fixed price, for the next eighteen years. *See* Papalote Br. [#31-1] Ex. A (Agreement). Papalote

1

completed construction of the wind farm in 2010, and for several years LCRA upheld its obligation to purchase all of the energy produced by the farm. *See id.* [#31] at 3.[1]

Sometime around 2014, however, energy prices dropped "precipitously," and LCRA faced a choice. LCRA Br. [#30] at 7. It could either (a) continue to pay a relatively high fixed cost for energy under the terms of the Agreement, or (b) breach the Agreement in order to take advantage of the lower energy prices prevailing in the open market. Papalote Br. [#31] at 7; LCRA Br. [#30] at 12–13. LCRA chose to breach the Agreement. LCRA Br. [#30] at 13. Now, LCRA seeks a declaration that the terms of the Agreement limit the damages it owes to Papalote for the breach.

## II. Contract Provisions

The Agreement contains several provisions concerning the damages and remedies in the event of a breach by either party. For starters, the Agreement provides for liquidated damages. Section 4.3 establishes that Papalote is entitled to liquidated damages in the event LCRA fails to take and pay for all energy produced by the wind farm. *See* Agreement at 19 (describing these liquidated damages as Papalote's "exclusive remedy hereunder"). A corresponding provision, § 4.2, establishes that LCRA is likewise entitled to liquidated damages in the event Papalote breaches its obligation to deliver energy to LCRA. *Id.*

In addition to liquidated damages, a non-breaching party gains access to additional remedies under § 6.2 and § 6.3 if the breaching party defaults by failing to remedy its breach in a timely fashion. In that circumstance, the non-defaulting party gains the right to terminate the Agreement and "accelerate all amounts then owing between the Parties." *Id.* at 22. The non-defaulting party may also demand the defaulting party pay a Termination Payment, which is calculated according to a formula set out in § 6.3. *Id.* at 22–23.

---

[1] In the interest of consistency, all page number citations refer to CM/ECF pagination.

Finally, and of particular importance here, § 9.3 imposes some limits on aggregate liability. Because the parties' dispute hinges on the interpretation of § 9.3, the Court excerpts the provision in full:

> **9.3 Limitation on Damages for Certain Types of Failures.** Notwithstanding anything to the contrary in this Agreement, Seller's aggregate liability for (i) failure of Seller to construct the Project and/or (ii) failure of one hundred percent (100%) of the Project's Turbines to achieve the Commercial Operation Date on the Scheduled COD and/or (iii) failure of one hundred percent (100%) of the Project's Turbines to achieve the Commercial Operation Date on June 1, 2011 and/or (iv) a Termination Payment, shall be limited in the aggregate to sixty million dollars ($60,000,000). *Buyer's damages for failure to perform its material obligations under this Agreement shall likewise be limited in the aggregate to sixty million dollars ($60,000,000).*

*Id.* at 28 (emphasis added).

### III. Procedural Posture

In October 2016, LCRA notified Papalote that it intended to stop taking energy under the Agreement, and around the same time, it came to light that the parties did not agree on how to interpret the last sentence of § 9.3. LCRA Br. [#30] at 13. LCRA believed the last sentence of § 9.3 limited its aggregate liability to $60 million. *Lower Colo. River Auth. v. Papalote Creek II, LLC*, 858 F.3d 916, 921 (5th Cir. 2017) (*Papalote I*). Papalote disagreed, and then refused LCRA's request to arbitrate the parties' dispute regarding the proper interpretation of § 9.3. *Id.* at 919–20. In response, LCRA filed suit to compel arbitration. *Id.*

Eventually, the Fifth Circuit concluded the parties' dispute was not arbitrable, *Papalote Creek II., LLC v. Lower Colo. River Auth.*, 918 F.3d 450, 456 (5th Cir. 2019) (*Papalote II*), and in March 2019, LCRA filed a separate lawsuit in this Court seeking a declaratory judgment that

3

its aggregate liability under the Agreement is capped at $60 million.[2] Complaint, *Lower Colo. River Auth. v. Papalote Creek II, LLC*, 1:19-cv-00656-SS, ECF No. 1. This Court consolidated that suit with the Fifth Circuit's remand of *Papalote II* and then heard oral arguments in August 2019 on the merits of the parties' dispute regarding the proper interpretation of § 9.3. *See* Order of June 13, 2019 [#27]; Tr. of Aug. 16, 2019 [#40]. The Court now proceeds to consider the merits of the parties' claims.

IV.     **Contract Interpretation**

When construing contracts, Texas courts look first to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, No. 17-0332, 2019 WL 2668317, at *4–5 (Tex. June 28, 2019). If the text of a contractual provision can be given a "certain or definite legal meaning or interpretation," then that provision is unambiguous and can be construed by the court as a matter of law without the aid of extraneous evidence. *Id.* at 5. To determine whether a contractual provision is ambiguous, the court must look at the language in dispute and interpret the words used according to their "plain, ordinary, and generally accepted meaning." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (citation and quotation marks omitted). However, when interpreting and assigning meaning to the terms used by the parties, the court must also consider the context provided by the provision at issue and the contract as a whole. *See id.* ("Contract terms cannot be viewed in isolation[] . . . because doing so distorts meaning.").

As noted above, the parties' disagreement hinges on the meaning and application of the last sentence of § 9.3, which states that "[LCRA's] damages for failure to perform its material obligations under this Agreement shall likewise be limited in the aggregate to sixty million

---

[2] Papalote later counterclaimed for a declaratory judgment that the Agreement does not impose such a cap. Answer & Counterclaims, *Lower Colo. River Auth. v. Papalote Creek II, LLC*, 1:19-cv-00656-SS, ECF No. 5.

4

dollars ($60,000,000)." Agreement at 28. Within the scope of this broader interpretive disagreement, the parties specifically dispute: (1) whether the last sentence of § 9.3 purports to cap the damages LCRA might owe to Papalote for LCRA's failure to fulfill its material obligations under the Agreement; (2) whether such a cap would apply to limit damages owed by LCRA in aggregate or, conversely, whether the cap would only limit LCRA's liability for a Termination Payment; (3) whether and to what extent a separate provision, § 9.4, conflicts with or overrides any cap imposed by § 9.3; and (4) whether liquidated damage payments voluntarily remitted by LCRA should count towards any cap imposed by § 9.3.

The Court approaches these arguments sequentially and first assesses whether § 9.3 functions to impose a cap upon damages owed by LCRA to Papalote.

### A. Does § 9.3 Purport to Limit the Damages that LCRA Owes to Papalote?

LCRA contends the last sentence of § 9.3 limits the damages that LCRA *owes* to Papalote in the event LCRA fails to perform its material obligations under the Agreement. LCRA Br. [#30] at 5. Papalote reads the disputed language differently. Papalote Br. [#31] at 3. According to Papalote, the phrase "LCRA's damages" refers to damages that LCRA would be entitled to *receive* if LCRA failed to perform its material obligations. *Id.* Thus, under Papalote's preferred interpretation, the last sentence of § 9.3 caps the damages that LCRA can receive for its own breach of contract and, correspondingly, does *not* cap the damages that LCRA would owe to Papalote for breach of contract. Papalote tacitly acknowledges its interpretation of the disputed language makes no sense—why would LCRA be entitled to receive damages for its own contractual breach?—but nevertheless contends the Court must adopt its interpretation because, in Papalote's view, its preferred construction represents the only conceivable interpretation of the phrase "LCRA's damages." Papalote Br. [#31] at 9–11.

5

Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, Black's Law Dictionary (11th ed. 2019). This definition does not clear up the interpretative dispute at issue here, which is how to interpret the phrase "LCRA's damages." On the one hand, and when viewed in isolation, "LCRA's damages" might be read to refer to money claimed by LCRA "as compensation for loss or injury." On the other hand, "LCRA's damages" might also be read to refer to money "claimed by, or ordered to be paid to" Papalote *by* LCRA.

Papalote insists the phrase "[LCRA's] damages" can only refer to damages that LCRA is entitled to receive, and admittedly, Papalote's preferred reading is perhaps the most common way to read the phrase "[LCRA's] damages." Papalote Br. [#31] at 9–10. But it is not the only possible reading. Indeed, LCRA has cited many legal opinions which use the phrase "so-and-so's damages" to refer to the damages owed by that person to someone else. *See, e.g., Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 940 (7th Cir. 2013) (recounting defendant's efforts "to moot the lawsuit and by doing so reduce the defendant's damages"); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir. 1999) (considering whether jury should have been instructed "that defendant's damages could be limited based on events that took place after [plaintiff's] termination"); *Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 524 (2d Cir. 1984) (noting jury normally determines whether plaintiff "could have mitigated defendant's damages"). If the Court were forced to read the phrase "[LCRA's] damages" in isolation, that phrase would be ambiguous because—in isolation—the phrase is susceptible of two divergent yet reasonable readings.

However, when interpreting and assigning meaning to the words used by the parties, the court must also consider the context provided by the rest of the contractual provision as well as

the contract as a whole. *Pathfinder*, 574 S.W.3d at 889. Here, the context provided by the rest of the sentence demonstrates the phrase "[LCRA's] damages" is susceptible of only one reasonable interpretation. Under LCRA's preferred reading, the phrase refers to damages that LCRA would *owe* to Papalote in the event that LCRA "fail[ed] to perform its material obligations" under the Agreement. That reading of the phrase "LCRA's damages" makes sense in the context in which it appears. Conversely, under Papalote's preferred reading, the phrase refers to damages that LCRA would *receive* for failing to perform *its own* material obligations. That makes no sense at all, because in the event that LCRA breached its material obligations, Papalote would be the party entitled to receive damages, not LCRA.

In sum, the phrase "[LCRA's] damages" is susceptible of two reasonable interpretations when viewed in isolation. Because only LCRA's reading of "[LCRA's] damages" makes any sense when that phrase is read in the context of the sentence in which it appears, the Court concludes that the phrase "[LCRA's] damages" is unambiguous and that it refers to damages that LCRA would owe to Papalote in the event LCRA failed to fulfill its material obligations under the Agreement.

### B. Does § 9.3 Only Limit LCRA's Liability for a Termination Payment?

Since the Court concludes § 9.3 caps the damages that LCRA might owe to Papalote, the Court now turns to assess the manner in which that cap applies. Papalote contends that because the last sentence of § 9.3 states that LCRA's damages are "likewise" limited to $60 million, LCRA's damages must be limited in the same way that § 9.3 limits the damages that LCRA can receive from Papalote. Papalote Br. [#31] at 13–15.

Section 9.3 limits Papalote's liability for damages in four separate scenarios. Three of these scenarios are inapplicable to LCRA because they involve liability for failure to construct or

7

operate the wind farm. Since Papalote is the party responsible for constructing and operating the wind farm and since LCRA does not participate in either of those obligations, there is no coherent means by which LCRA's liability in such scenarios might be "likewise" limited.

The fourth scenario delineated by § 9.3 concerns Papalote's liability for a Termination Payment. Papalote contends that by "likewise" limiting LCRA's damages, the last sentence of § 9.3 similarly limits LCRA's liability for a Termination Payment, but not for liquidated damages due under § 4.3. Papalote Br. [#31] at 13–15.

There are two problems with Papalote's proposed reading of "likewise." First, it doesn't make a lot of sense. Of the four ways in which § 9.3 cabins Papalote's liability for damages, only one could possibly apply to LCRA. Second, and even more saliently, Papalote's reading would require ignoring the fact that § 9.3 explicitly limits LCRA's "damages *for failure to perform its material obligations*." Agreement at 28 (emphasis added). Papalote's preferred reading elides this limitation and instead rewrites the last sentence of § 9.3 so that it limits LCRA's damages "for a Termination Payment" instead. But as Papalote has repeatedly pointed out, this Court is constrained to interpreting the language of the Agreement as written—it cannot rewrite the last sentence of § 9.3 to impose the narrower liability limitation that Papalote would prefer.

Papalote protests that if the Court reads § 9.3 to limit LCRA's liability "for failure to perform its material obligations," then the word "likewise" will have no meaning and will be rendered surplusage. The Court disagrees. "Likewise" cannot reasonably be interpreted to mean that LCRA's liability for damages is only limited with respect to a Termination Payment. "Likewise" can, however, be reasonably interpreted to mean that just as Papalote's liability is limited in certain circumstances to $60 million, LCRA's damages owed to Papalote for failure to

perform its material obligations are *also* limited in the aggregate to $60 million. Under this reading, the word "likewise" simply means "also."[3]

The Court thus concludes the last sentence of § 9.3 means what it says and serves to limit the aggregate damages owed by LCRA to Papalote "for [LCRA's] failure to perform its material obligations" and not just for a Termination Payment.

### C. Does § 9.4 Conflict with or Override § 9.3?

Papalote next argues § 9.4 conflicts with and overrides § 9.3 for purposes of calculating LCRA's liquidated damages under § 4.3. Papalote Br. [#31] at 15–18. In relevant part, § 9.4 states that "for any provision for which an express and exclusive remedy or measure of damages is provided, such express remedy or measure of damages shall be the sole and exclusive remedy, [and] the obligor's liability shall be limited as set forth in such provision[.]" Agreement at 28. Papalote contends that because § 9.4 states "liability shall be limited as set forth" in provisions setting forth exclusive remedies, liability limitations appearing in other provisions—such as § 9.3—are ineffective.[4] Papalote Br. [#31] at 15.

The problem with this argument is that § 9.4 does not explicitly state liability shall be limited *solely* as set forth in provisions establishing exclusive remedies. Papalote implies the Court should insert the word "solely" into § 9.4, so that it would then read: "[T]he obligor's liability shall be limited *solely* as set forth" in any provision providing "an express or exclusive remedy or measure of damages." Agreement at 28 (hypothetical insertion in italics). But the

---

[3] Although under this reading "likewise" is arguably surplusage, in the Court's view, the word "also" can nearly always be omitted without altering grammatical meaning of the sentence in which it appears. Nevertheless, writers continue to use it, because even though it is redundant, it is a useful organizational tool that serves to establish a parallel with whatever came before.

[4] Papalote also makes a related argument that insofar as a conflict exists between § 9.3 and § 9.4, the Court should interpret § 9.3 narrowly to avoid such a conflict. Papalote Br. [#31] at 16–17. But the Court has already concluded that the last sentence of § 9.3 is unambiguous and susceptible of only one reasonable interpretation. *See supra* Section IV.A.

9

Court eschews such an interpretation here because "Texas law generally mandates that one contract provision not be interpreted in a way that nullifies another provision." *Greater Hous. Radiation Oncology, P.A. v. Sadler Clinic Ass'n, P.A.*, 384 S.W.3d 875, 886 (Tex. App.—Beaumont 2012, pet. denied).

On the other hand, § 9.3 *does* explicitly limit LCRA's damages. Agreement at 28. What's more, the liability limitations contained within § 9.3 apply "[n]otwithstanding anything to the contrary in this Agreement."[5] For these reasons, the Court concludes that § 9.4 does not affect or nullify the liability limitations established by § 9.3.

### D. Do Voluntary Payments Count Towards the Cap?

Finally, Papalote argues that even if § 9.3 caps the aggregate damages that LCRA owes to Papalote, the cap does not take effect until LCRA "fail[s] to perform its material obligations." Papalote Br. [#31] at 21–22. Papalote contends LCRA has not yet failed to perform its material obligations because, although LCRA is refusing to accept or pay for energy from Papalote, it has been making liquidated damage payments as required by § 4.3. *Id.* In this vein, Papalote argues the liquidated damage payments made by LCRA thus far should not count towards the $60 million cap because they are not damages for failure to perform. *Id.*

The Court rejects Papalote's argument and concludes the damages paid by LCRA under § 4.3 qualify as "damages for failure to perform its material obligations." Indeed, § 4.3 describes the payments as damages, and LCRA is paying them because it has been refusing to accept or pay for energy produced by Papalote's wind farm. In turn, accepting and paying for energy

---

[5] Papalote argues the "notwithstanding" clause appended to the first sentence applies only to that sentence—which limits Papalote's liability—but not to the second sentence—which limits LCRA's liability. Papalote Br. [#31] at 17. The Court disagrees and concludes that by "likewise" limiting LCRA's liability for damages, the second sentence of § 9.3 incorporates the "notwithstanding" clause included within the first sentence. And even if it did not, § 9.3 would still control because § 9.3 explicitly limits LCRA's liability for damages, and § 9.4 cannot override that explicit limitation by generally stating that "liability shall be limited as set forth in such a provision." *See Pathfinder*, 574 S.W.3d at 889 ("[A] specific contract provision controls over a more general one." (internal citation and quotation marks omitted)).

10

produced by the wind farm are two of LCRA's material obligation under the Agreement. Because liquidated damages payments made by LCRA constitute damages "paid for failure to perform . . . material obligations," the Court concludes those payments count towards the $60 million cap established by § 9.3.

## Conclusion

The Court concludes the last sentence of § 9.3 is unambiguous and subject to only one reasonable interpretation. That interpretation limits to $60 million the aggregate damages that LCRA must pay to Papalote for LCRA's failure to perform its material obligations. Further, § 9.4 does not affect the application of § 9.3. Finally, the Court concludes the liquidated damages paid thus far by LCRA count towards the $60 million cap established by § 9.3.

Accordingly,

IT IS ORDERED that Papalote's Motion for Summary Judgment [#36] is DENIED;

IT IS FURTHER ORDERED that LCRA's Cross-Motion for Summary Judgment [#39] is GRANTED; and

IT IS FINALLY ORDERED that Papalote's Motion to Strike Extrinsic Evidence [#32] is DISMISSED AS MOOT because the Court did not consider any of the evidence that Papalote sought to strike.

SIGNED this the 26th day of August 2019.

SAM SPARKS
SENIOR UNITED STATES DISTRICT JUDGE